(35 App. Div. 596.)

METCALF et al. v. MOSES et al.

(Supreme Court, Appellate Division, First Department. December 30, 1898.)

1. FRAUDULENT CONVEYANCES—EVIDENCE.
    A firm, whose assets exceeded its liabilities by nearly $70,000, of its own motion confessed judgments to several creditors, assigned a large number of accounts to another creditor, and transferred the premises occupied by it to another creditor, after which a receiver was appointed in a suit brought by two members of the firm. The books of the firm disappeared. There was no evidence that any creditor had demanded his money before this action was taken, and the receiver appointed knew nothing of the matter until after his appointment. *Held*, that these facts justified a finding that the transaction was a scheme to defraud those creditors not preferred.

2. SAME—PARTICIPATION BY GRANTEES.
    Where a firm, with intent to defraud some of its creditors, confesses judgment in favor of other creditors on its own motion, the fact that the judgment creditors adopted the act of the firm makes them participators in the scheme.

3. SAME—PURCHASER FOR VALUE.
    Where a firm about to make conveyances of its property in fraud of creditors conveys property to a creditor who has no knowledge of the condition of the firm, or its fraudulent designs, and does so in accordance with a previous agreement with him, he is a purchaser for a valuable consideration, within 2 Rev. St. p. 137, § 5, providing that the title of a purchaser for a valuable consideration shall not be impaired by statutory provisions invalidating transfers in fraud of creditors.

4. RECEIVERS—APPOINTMENT BY COLLUSION.
    Where a receiver of a partnership is appointed by collusion of the partners, and upon false representations, such appointment is within 2 Rev. St. p. 137, § 1, providing that every conveyance or assignment made to hinder or defraud creditors shall be void, and such receivership should be set aside so far as it concerns the interests of protesting creditors, and the funds in the receiver's hands applied to the payment of the indebtedness of such creditors.

5. SAME—SETTING ASIDE.
    In an action to set aside the appointment of a receiver, the answer of the receiver was not served upon a creditor to whom a number of accounts had been assigned before the receiver was appointed. *Held*, that under Code Civ. Proc. § 521, providing that, where a judgment may determine the rights of two or more defendants as between themselves, the defendant demanding such a determination must serve a copy of his an-

swer upon defendants to be affected by such determination, the assignment could not be set aside in such action.

Appeal from special term, New York county.

Action by Manton B. Metcalf and others against Morris Moses and others. From a judgment giving plaintiffs partial relief (50 N. Y. Supp. 1060), plaintiffs and certain of defendants appeal. Modified.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, McLAUGHLIN, and O'BRIEN, JJ.

A. Blumenstiel, for appellants Lesser and Adler.

John Frankenheimer, for appellant Marcus.

Samuel Greenbaum, for appellant Lilianthal.

Nelson S. Spencer, for appellants M. B. Metcalf and others.

E. J. Myers and James Byrne, for respondents receivers.

RUMSEY, J.   This is an action brought by the judgment creditors of the firm of Lesser Bros., composed of Tobias, Israel, and Simon Lesser, to set aside certain judgments confessed by that firm to the defendants Marcus, Bernard Moses, and Tobias Lesser, as guardian, respectively, and a transfer of a part of the accounts of the firm to the defendant Morris Adler, and conveyances of real estate by two members of the firm to the defendant Lilianthal, and certain proceedings had in an action brought by one of the firm of Lesser Bros. against the other two members of the firm, in which receivers were appointed, who have taken possession of a large amount of the assets of the firm.   The trial of the action resulted in a judgment by which each of these transactions, except the appointment of a receiver, was set aside as fraudulent as against the plaintiffs, and judgment was ordered that the defendant Adler, who had received a considerable amount of money from the accounts assigned to him, should pay that money over to the receivers, who should hold it and other moneys still in their possession subject to the further order of the court.   The judgment also set aside the conveyances to Lilianthal, as fraudulent as against the plaintiffs.   The plaintiffs appeal from so much of this judgment as directs the transfer to the receivers of the moneys collected by Adler, and as permits the receivers to hold the moneys now in their possession, proceeds of the personal property of Lesser Bros. The other defendants, except the receivers, appeal from the judgment generally, and the receivers alone appear here as respondents only. The action was determined upon the theory that all the transactions which resulted in these several confessions of judgments and transfers of property were part of a scheme devised by Lesser Bros. to hinder, delay, and defraud the creditors who were not preferred, and to enable the debtors to conceal a large amount of their assets, which in fact were not turned over to anybody.

The Lesser Bros. were a firm of merchants engaged in the manufacture and sale of clothing in the city of New York.   So far as appears in the case, their business had apparently been prosperous down to the 1st day of October, 1896; and there is nothing to show that down to that time any one connected with the business, or any one dealing with the firm, had any reason to suppose that the condition of the

firm was other than what it appeared.    The firm had been in business from the year 1885.    Tobias Lesser had charge of the financial department;  Simon Lesser, of the manufacturing department;  and Israel Lesser was a traveling salesman, engaged in selling goods for the firm, and was in New York but a small portion of the time.    In the month of January, 1895, the firm had a surplus of $145,739, which in a year from that time had increased to $153,866.    In January, 1896, the merchandise of the firm was worth $136,582, and the accounts receivable were $121,365; making, with some other items, total assets of $266,044.    The total liabilities of the firm at that time were $112,-000, of which $40,000 was for bills payable.    From the month of January, 1896, down to the 1st of October, 1896, when these transfers were made, there had been no catastrophe, and no reason is shown in the case why there should have been any very material loss of assets. It is quite clear from the testimony of the different members of the firm that Simon and Israel Lesser, at least, had no reason to believe that the affairs of the firm, which before that time had been prosperous, had experienced any change, or that there was any reason why the business should not continue.    In fact, it is testified by each member of the firm that Simon himself insisted at the time the transfers were made that the business should be continued, and claimed that there was no reason to close it up.    The story of the disaster which took place on the 2d of October is told plainly by Tobias Lesser, who evidently devised it.    Unfortunately, however, it is quite evident that in so much of it as gives his reasons for believing that the affairs of the firm were in a precarious condition there is no foundation of fact to stand upon, and it is utterly unworthy of belief.    He says that for some time before the 1st of October he had been seriously annoyed by demands of creditors whose claims were not yet due, insisting that those claims should be paid, for the reason, as they said, that the firm was expected to fail; but he gives no reason for any such belief, and he does not suggest that he himself had any such idea. He says that on the 1st of October he had become so much worried by these claims that he had concluded that the business must be brought to an end, and on that day he advised his brothers of the fact that the business could no longer continue.    His brothers say that they received that information on that day, and it is quite clear from the evidence that the information was entirely unexpected by either of them.    No reason is given by Tobias Lesser why the firm should not still be solvent, nor is any satisfactory explanation given of the alleged loss of the surplus, which 10 months before had been over $150,-000.    He says that, of the bills and accounts receivable, there were bad debts to the amount of $10,000 or $20,000; that the stock had depreciated in value $30,000 to $40,000; that $30,000 to $40,000 worth of goods had been shipped to California for sale, upon which the loss was $15,000 to $20,000; and that the firm had invested in a patent in which they had lost $5,000.    He says that these are all the losses they had incurred, and that the debts of the firm had not increased much, if at all, between January and October.    It is very doubtful if any such losses were made, but if the amount of them be deducted from the surplus shown to exist in January, 1896, there would still

be a surplus of $69,000 which is largely unaccounted for. There was no corroboration of this testimony of Tobias Lesser as to any of these losses. The books of the firm had been spirited away. No one is able to account for them, and no one is able to say what was in them. Not even the receivers, who took possession of the assets of the firm on the 3d of October, had ever seen them. No creditor is produced who demanded his pay before the 1st of October, and, of all the facts above stated as coming from Tobias Lesser, there is no single person to corroborate one. Down to the day when the transfers were made, the firm had been in the full tide of business, receiving large sums of money, and paying their accounts as they became due, and every account which fell due up to that time was paid as it matured. The goods were purchased upon credit in the same way as they had been before, and a considerable amount of the liabilities of the firm existing at that time was for goods which had been recently purchased. Yet on the 1st of October this apparently prosperous firm, whose assets, even taking the worst view of them, should have amounted to nearly $70,000 more than their liabilities, was in such a condition that all their assets would not pay 40 per cent. of the indebtedness, which was very little more than the amount of indebtedness shown in January, 1896. These facts, of themselves, cast a grave doubt upon the good faith and honesty of the members of the firm in the transactions which took place on the 2d of October, and afford sufficient ground for the inference drawn by the trial justice that the transactions of that day were had with intent to defraud the then creditors of the firm.

On the 1st of October, when Tobias Lesser informed his brothers that the firm was no longer able to continue in business, neither of them expressed any astonishment at that fact, although it is evident from what they say that they had had no reason to suppose that such a condition of affairs existed. They at once acceded to the proposition made by Tobias Lesser to transfer the property of the firm for protection of certain of the creditors. The determination to do this having been made, it was carried into effect in the following way: Three creditors were selected to whom judgments were to be confessed. One of those was Tobias Lesser himself, as guardian of certain infants whose money it was said had been lent to the firm. The two others were Mrs. Marcus and Bernard Moses, who, it was said, had also lent money to the firm. Neither of these persons had demanded the payment of their loans, or had made any effort to collect them. On the afternoon of October 1st, after the conclusion had been reached by the partners to break up their business, Mrs. Marcus' son was informed that the firm must fail, and that they intended to confess a judgment to his mother to secure the money lent by Mrs. Marcus; and permission was asked that the firm might employ Mr. Blumenstiel, their attorney, to act as attorney for Mrs. Marcus, to have the confession made. This was acceded to by Mr. Marcus, who says that he told his mother of the matter that night, and that she ratified what he had done. Bernard Moses, the other creditor to whom a judgment was confessed, had no knowledge whatever that anything of the kind was to be done until the 3d day of October, after the judg-

ment had been confessed, and execution issued upon it to the sheriff. The whole transaction with regard to the confession of the judgments originated with Tobias Lesser, was set in motion by him, was carried out by him, and in doing it he acted for the judgment creditors precisely to the same extent as any other person would act who had been employed by them to secure their debts in that way. On the 2d of October these judgments were confessed, and executions were at once issued upon them to the sheriff of the county of New York, who proceeded to make a levy. On the morning of that day, and before the confessions were made, Adler, who was superintendent of the Lessers in the clothing department, was called to the office, and told that the firm was about to fail, and that they proposed to assign to him a quantity of accounts to pay the sum of $22,500 which he had lent to them; and it was suggested to him that he should go down to Mr. Blumenstiel, and procure the assignment to be had, which he did. Before that had been done, and on the same day, Tobias Lesser and Israel Lesser transferred to the defendant Lilianthal the premises which were occupied by them, respectively, in payment or as security for a debt which the firm owed to him. That transfer will be considered more at length later. The firm had now put out of their hands nearly, if not quite, all the accounts, and had procured the goods in their store to be levied upon by the sheriff, so that substantially everything in sight was put out of the way of the creditors who were not preferred. In anticipation, however, of a possible surplus, they signed an assignment to the persons to whom judgments had been confessed, of all the accounts not assigned to Adler, as security for any deficiency that might exist after the sale of the goods upon which levies had been made under their executions. This assignment, however, does not appear to have been delivered to anybody, or to have been assented to by any of the persons for whose benefit it was apparently intended. It may, therefore, be left entirely out of the case, except so far as it is an indication of the intention of the Lessers to put all their property out of the reach of every other creditor than those preferred. After all these things had been done by the three members of the firm, in which all amicably joined, there arose, as is stated by them, "a wrangle" upon some subject, which is not very clearly explained, the result of which was an action brought by Tobias and Israel Lesser against Simon, alleging that the firm was insolvent and unable to pay its debts; that many of the accounts had been assigned to secure and protect certain creditors; that the parties to the action could not agree as to the manner in which the assets should be liquidated and divided, or as to the form of dissolution; that a large amount of debts owing by the firm were about to mature; and that there was danger that suits would be brought against them and judgments recovered, and in view of these facts it was important that a receiver of the assets should be appointed, and the partnership dissolved; and the relief asked was that a receiver should be appointed, and the parties restrained from further disposing of, or in any manner interfering with, the assets. The transactions had on the 2d of October were not stated in this complaint, or in the affidavit accompanying it; nor was there any intimation as to the true manner in, or purposes for, which the

assets of the firm had been disposed of. The summons and complaint were served at once upon the defendant, who immediately proceeded to appear and consent to the appointment of a receiver, and the defendant Morris Moses was on the same day appointed a receiver of the firm. Moses says that he was never consulted as to his appointment; that he knew nothing about it until he saw mention of it in the papers the next morning, and received advices that he had been appointed, from the security company that was to give a bond for him; and thereupon, without any consultation with either of the Lessers, he went to the office of the security company, gave the bond, and qualified and assumed his duties as receiver on the 3d of October. If this story of Moses is true, it necessarily follows that the parties to the action had procured him to be appointed receiver, and had done everything necessary to enable him to qualify, without advising him of the fact of his appointment. Down to this time, so far as appears, not one creditor whose debt was due had made any effort to secure the payment of his debt. No one had suggested that this firm was not entirely solvent. There was no reason to believe from the action of any creditor that perfect confidence was not felt in their solvency and ability to pay their debts as they matured, and in fact every debt had been paid as it fell due. No reason is apparent throughout this case why any one of these steps had been taken. The result of them was to prefer creditors to a small amount, to put out of the hands of these debtors a very large amount of assets which should have gone to the payment of all the creditors, and without any reason whatever, so far as appears, to have put every dollar of their visible assets in such a situation that the real creditors, other than those preferred, could not reach them. In addition to that, it is almost necessarily to be inferred that a very large amount of the property of this firm was not turned over to the receivers, but had disappeared in some unexplained manner. In view of all these facts, there can be no doubt that the justice at the trial term was entirely justified in coming to the conclusion that these transactions constituted a scheme for the purpose of defrauding the creditors of the Lessers who were not preferred.

But the defendants to whom judgments were confessed insist that there is no evidence that they participated in this scheme, and for that reason they contend that within the rule laid down in the case of Galle v. Tode, 148 N. Y. 270, 42 N. E. 673, there was no sufficient case made against them. In that case it was said in the opinion that the fraudulent intent of a failing debtor in confessing a judgment for a bona fide indebtedness will not of itself render the judgment void, within the meaning of the statute of frauds (2 Rev. St. p. 137, § 1), and in the absence of knowledge of such intent, or some participation in the fraudulent scheme by the judgment creditor, such judgment, as to him, may be treated as free from fraud. Without considering whether the question thus determined was necessarily involved in the decision of that case, it is sufficient to say that the facts here do not bring the judgment creditors within its protection. It appears in this case that the judgment creditors took no part in any of the proceedings which led up to the confessions in their favor. Tobias Lesser, whose intent to defraud is undoubted, took upon himself to manage

the entire business for these persons. He did this to enable him to carry out a scheme he had devised to defraud third parties. He had no intent to defraud Marcus or Moses, but he proposed to use them as instruments to defraud others. The confessions of judgment were an integral part of this scheme. He was authorized to make them by Mrs. Marcus, and his acts in doing so were accepted by Bernard Moses after they had been done. He stands, therefore, as the agent of these people, selected by them for the purpose of confessing a judgment which was devised by him for the express purpose of hindering, delaying, and defrauding other creditors of the firm. The persons who thus adopted his act done for that purpose are not in a position to say that they did not participate in the intent which he had. It may be that if each of these persons had been pursuing the Lessers for the payment of his debt, and insisting upon security for it, and the judgment had been confessed, upon his procurement and demand, to save the time and expense of an action, the case would be within the case of Galle v. Tode, supra, and the question would arise whether the doctrine therein laid down was necessary to the decision of the case. But nothing of the kind exists. The fact of the adoption by these judgment creditors of the act of Tobias Lesser, originated by him for the purpose of defrauding other creditors, makes them at least participators in the scheme, and charges them with the intent which he had to defraud the creditors. As to those defendants, therefore, it is clear that the judgment must be affirmed.

But as to Lilianthal different conditions exist. There is no doubt that he, also, was a creditor of this firm. The transfer was made to him in pursuance of an agreement made between himself and the Lessers on the afternoon or evening of the 1st of October. There is no pretense that at this time he had any knowledge of the condition of the firm, except what was told to him, and that he was aware that the information then received was not actually true. There is positively no evidence that he had any notice of the fraudulent intent of his grantors, or of the fraud that they were about to commit. There was nothing, therefore, to prevent his accepting these transfers, either as payment or as security for his debt; and, whether he accepted them as payment or security, he was equally a purchaser for a valuable consideration, within section 5 of the statute of frauds (Murphy v. Briggs, 89 N. Y. 446; Sommers v. Cottentin, 26 App. Div. 241, 49 N. Y. Supp. 652), and entitled to be protected under that section, in the absence of proof that he participated in the fraud (Starin v. Kelly, 88 N. Y. 418; Loos v. Wilkinson, 110 N. Y. 195, 18 N. E. 99). As to him, therefore, the judgment should be reversed, with costs.

The trial court stated in its decision that the Lessers, "by collusion among themselves, procured a receiver of their partnership property, nominated by them and under their control, namely, the defendant Morris Moses, to be appointed by this court, upon false and fraudulent statements appearing in the papers presented to the court upon the application for such appointment, whereby, and by the concealment and suppression of material facts and circumstances, the said defendants imposed upon the court, and the court was misled in making said appointment." Nevertheless the learned justice at the special term con-

cluded, in spite of that.fact, that the receivership should not be set
aside as to the plaintiffs, but that all the property disposed of by the
Lessers in fraud of the creditors should be turned over to these receiv-
ers, to be distributed pursuant to the order of the court.    He was
probably led to this conclusion by the fact that after the appointment
of Moses a motion was made to remove him, which resulted in the
selection of Mr. Franklin to act as joint receiver with Moses, at the
request of the creditors.    Undoubtedly the appointment of Franklin
was made in good faith, and was proper, but the appointment is in-
fected with the vice found to exist in the original action, which was
brought as a part of the scheme to defraud the creditors of the firm;
and there is no logical or legal reason why the court, when it condemns
that scheme, should permit the effective part of it to stand, as against
the rights of these plaintiffs, and thereby practically deprive them of
the lien upon the property in the hands of the receivers which they
otherwise would have acquired by the entry of this judgment.    So far
as the plaintiffs are concerned, they are entitled to have the whole
transaction set aside, because it is fraudulent as to them.    The essen-
tial part of the transaction was the proceeding taken in this collusive
action, and that is just as much a fraud upon them as were any of the
other transfers which have been set aside.    These receivers were not
purchasers for a valuable consideration.    Their appointment was made
in a suit commenced with the intent to hinder, delay, and defraud the
creditors of the parties to the action.    It is precisely within section 1
of the statute of frauds (2 Rev. St. p. 137, § 1), and for that reason it
was error to refuse to set aside that appointment, so far as the plain-
tiffs' rights were concerned.    The judgment, therefore, so far as it
permits the receivers to hold this money against the plaintiffs' judg-
ment, should be reversed upon the plaintiffs' appeal, with costs.

   This action is brought by the plaintiffs in their own behalf, and not
in behalf of any other persons who might join in it.    Although the
facts show that as to these plaintiffs all the transactions were fraudu-
lent, yet, as between the parties themselves, they cannot be impeached
in this action; and the plaintiffs are only entitled to such a judgment
as will protect their rights, and enable them to recover the amount of
their judgments, with interest and the costs to which they are entitled;
and whatever surplus of property or money there may be after accom-
plishing this object is not to be interfered with in this action, but
to be left where these parties have put it, subject to the rights of other
creditors, or to such direction as the court may give with regard to it
in the action by virtue of which the money came into the hands of the
receivers.    It appears that there was in the hands of the receivers much
more money than was necessary to pay the plaintiffs all that they were
entitled to.    This money was the proceeds of property which might
have been levied on by virtue of execution issued on plaintiffs' judg-
ments, had it not been sold by the receivers.    For these reasons it was
not necessary for the protection of the plaintiffs that all these transac-
tions should be set aside.    Comyns v. Riker, 83 Hun, 471, 31 N. Y.
Supp. 1042; Kennedy v. Barandon, 67 Barb. 209.    So far as they were
concerned, the judgment should simply have provided that their judg-
ment, with interest and such costs as might be awarded to them, should

be paid out of the fund, and, as to the remainder of the money, it should be left where the parties had put it.

The judgment sets aside the transfer of the accounts to the defendant Adler, and requires that he shall pay to the receivers whatever he has received by the collection of these accounts. There is no direction that this money, or any portion of it, shall be paid to the plaintiffs. Indeed, as entered, the judgment does not seem to have in view the payment of any sum to the plaintiffs, except so far as it may be hereafter directed upon an accounting to be had by the receivers. The judgment against Adler, therefore, is in fact the granting to the receivers of affirmative relief as against him. But it appears in the answer of the receivers that no charge is made against Adler, and no claim is made by either of them that the assignment to him was fraudulent, or that there was any reason why it should be set aside; nor is any affirmative relief asked against him. All the relief that is asked by either of the receivers is addressed to the confession of judgments. No attack is made upon the assignment to Adler; nor any request made that it should be set aside, or the moneys received upon it paid over. Even if the answers of the receivers had been served upon Adler pursuant to section 521 of the Code of Civil Procedure, there would be nothing in them to indicate that any affirmative relief was sought as against him. But there is no proof or claim that those answers were served upon him. The receivers, therefore, were not entitled in this action to any affirmative relief against him. For that reason there was no propriety in granting to the receivers the relief which they have procured as against Adler, and the judgment, so far as it does that, must be reversed. If it were necessary that the money obtained by Adler under his assignment be used to pay the plaintiffs' claim, we might be called upon to discuss the question whether it should be paid over to a receiver to be appointed in this action; but it affirmatively appears that no such necessity exists, because the money now in the hands of the receivers is sufficient to leave a considerable surplus after payment of the plaintiffs' claim. For this reason it is not necessary to give any further directions with regard to the claim against Adler. The receivers are not in a situation to ask relief against him here, nor do the plaintiffs require any affirmative relief. The judgment, therefore, as against him, is reversed, simply for the reason that as to him the receivers are not entitled to affirmative relief upon the pleadings as they stand.

The conclusion of the whole matter is this: As to the defendant Lilianthal, the judgment must be reversed, with costs against the plaintiffs. As to the defendants the Lessers and Marcus and Bernard Moses, the judgment is affirmed, with costs to the plaintiffs. As to the defendants Morris Moses and James T. Franklin, as receivers, the judgment, so far as appealed from by the plaintiffs, is reversed, and as to the defendant Adler the judgment is reversed. The defendant Adler should not have costs as against the plaintiffs, because this judgment by which he was directed to pay the money to the receivers was not in their interest, and was appealed from by them. The judgment should be modified by providing that the receiverships, being made with intent to hinder, delay, and defraud the plaintiffs as credit-

ors of the Lessers, should be declared void as to them, and the receiv-
ers should be required to pay to the plaintiffs, out of the funds in their
hands, the amount of the plaintiffs' judgments, with interest, and the
costs awarded in the court below, and the costs of this appeal, which
are hereby awarded to the plaintiffs.   All concur.